Next matter, number 171693, James Ellis et al. versus the Fidelity Management Trust Company. Your Honor, may it please the Court, Garrett Watkins. Just give us a minute. Apologies. May it please the Court, Your Honor, it's Garrett Watkins on behalf of plaintiffs and the certified class in this case. As an initial matter, I'd like to reserve three minutes of my time, if I could. Yes, you may. Thank you, Your Honor. Briefly, I'd like to just talk about what this case is and what this case is not. I think we can all agree, having jointly made it through the briefing in this case, that it's a complicated case. A case about fiduciary duty and the management of conservative investments, one conservative investment in particular, under ERISA. And there are five or six things that are just clear at this point, even though the case is very complicated. And I just want to run through them quickly so we all have them in hand, as it were. The first is, and obviously plaintiffs think this is critically important, the first is that there's a completely clear record that for all or most of the class period in this case, the fund in question, the Fidelity managed income portfolio, was managed by Fidelity, who is in this case an admitted ERISA fiduciary, in such a way as to fail to meet one of its two primary stated investment goals. And that is to produce a competitive level of income. Does it say competitive? In the fund documents, yes it does, Your Honor. And it says those are two primary goals? I thought there was one primary goal here. Well, that's the subject, good question, Your Honor, that's a subject of some dispute between... Well, but it's there in the documents, isn't it? It is. And the primary goal here, as I understand it, is to conserve income, conserve principal. No, there's actually one statement, Your Honor, that we reference in the briefs that says the goal of the fund is to earn a competitive level of income consistent with capital preservation, so there are two goals of the fund. You can see why, in Fidelity's words, they would like it if the sole, only goal of the fund were capital preservation, in other words, not to lose invested capital, but that's not the case. As you read it to us, you put competitive at the end. It says competitive in keeping with getting a preservation. That's right, Your Honor. And then it also provides you something very tangible. It provides you a benchmark, Barclays, I recall. Yes, Your Honor. And then it exceeds, the results then exceed the benchmark that they told participants they were going to use. Correct. And our point, Your Honor, our point is, and we believe if an independent fiduciary, for instance, had been installed during the class period, as sometimes is the case in situations like this, they would have opined, as Fidelity's counterpart, J.P. Morgan, opined, that the use of that benchmark itself was imprudent, that that benchmark is no benchmark at all. The benchmark is like shooting free throws from three feet away. That's where you lose me. Can an illicit fiduciary set up an investment vehicle at the conservative end? It gives a menu to its employees. One of them could be junk bond funds at one end, perhaps. At the other end, it's got money market funds. So they could have set up, these people could have run into a money market fund. Those, in other words, who invested in this particular fund, Your Honor? Yes. Yes, they could have. And that would have gotten a lower rate of return. That's very much open to question. The way Fidelity managed this fund, it made, as we all know, almost no money. During this time period, you think money market funds would have exceeded this? I think we would have to have that evidence before the district court. Well, let's assume it was pretty low. So they set up another one that says, well, you have a stable value fund, but we'll use Barclays, which is a low benchmark. Sure. And they then do that, and they exceed Barclays. How can that be imprudent? And then they could have set up a third fund that said, this will be a stable value fund, but we'll be a little more aggressive. Sure. And we'll use a higher benchmark. Understood. I'm having trouble seeing what exactly they did wrong here by setting up a stable market fund that had a conservative benchmark. Understood, Your Honor. That is, as I said, it's all complicated here. We understand that. Frankly, that's why we feel like we deserve a trial. It should have been given the inferences. You don't get a trial just because you say it's complicated. I think you need to explain the complication to us. Absolutely. So what went wrong here and what was done wrong is, regardless of what benchmark they use, say there's an order from God that says fidelity's use of the one- to five-year Barclays benchmark is prudent. Everything's fine with that. Okay. If that were in place, hypothetically, we would still, in our view, win our case. And I'll tell you why. Fidelity's procurement of what is called RAP insurance in this case, one of the core assets of this fund, what actually makes money, when the fund does make money, it's the underlying securities purchased for the fund by Fidelity and the RAP insurance that protects them and, in some instances, supplements them. We have record evidence, and I'm happy to, indeed, I would like to give sites so the panel can go back and look at this. We have record evidence that was properly before the district court that Fidelity made asset selections with respect to procuring RAP insurance with an eye toward increasing its own fees, not toward increasing the income paid by the fund or advancing any other goal of the fund. This purported RAP crisis, as I'm happy to explain with evidence, and we did explain in our brief, is not a crisis at all. Let me ask you about that because that puzzled me too. It seems to me there are two conceivable scenarios. One is there is a fixed finite supply of RAP that is inelastic with respect to price demand or anything else. Yes, Your Honor. And so you've got to get there, get there first somehow, and if you've got it, no one else can get it. The second scenario is the more unusual scenario where RAP, like most everything else, is not fixed. It's elastic with respect to demand in some respect. I'm having trouble seeing how under either scenario your positive motive would make any sense because if it were the first finite situation, then they darn well should try to grab it up first. Absolutely. If it's the second scenario, then the strategy you posit them having would make no sense because they would simply be paying more than you need to pay and it would not deprive any competitor of anyone because of the elasticity. I absolutely agree, Your Honor. The third scenario, which is how we win and what we deserve to have a trial in, in my humble opinion, and that is this. Fidelity's own documents, one document in particular, which we cited multiple times, and that is the, I hope I pronounced his name correctly, the colocatronis email where the Fidelity Associate General Counsel says, well, our crediting rates suck, others are more committed to this business than we are, they're more flexible, they're more diversified, and this is important to the RAP question that you're asking, Your Honor. They say others are willing to use synthetic GICs, Guaranteed Investment Contracts, traditional GICs, mutual Omaha, and perhaps you, certainly true of me, when I started working on this case and saw that email, I'm wondering what the heck does that mean, and more to the point, why does it matter? Why does it matter? And this is why it matters. There's a third state of the world, and these, so you can go back and look at the documents, appear at Joint Appendix 3709, Joint Appendix 2938, those are the main documents, along with the colocatronis email, which is Joint Appendix 2084, and taken together with all inferences duly afforded to the plaintiffs, what those mean is this. The third scenario is one where, yes, there is a finite supply of what you would call traditional RAP insurance. We believe that is the case, Your Honor. That's the nature of our theory. However, there are other supplements, if you like, to RAP insurance, things that obviate the need to use traditional RAP insurance to enter into deals like the stringent J.P. Morgan RAP deal that drove down the crediting rate in the fund, and that is what are called separate account GICs, referenced in that Fidelity email, also called bundled synthetic RAPs, which are referenced in that article that I just cited, which is in Fidelity's document production, and what those documents say, Your Honor, is that Fidelity never had a RAP crisis in the sense that they're portraying it. At all times, Fidelity could have protected the capital integrity of the fund by using bundled synthetic RAPs slash separate account GICs, which are different than traditional RAP insurance, but to protect its assets under management because, Your Honor, were Fidelity to use these separate account GICs, Let me interrupt you at that point, because it seems to me you've just eliminated the motive that your brief tells us, because if there was available, and Fidelity knew there was available, an alternative to RAPs, i.e. the GICs, then your positive strategy that it was trying to buy up all the RAPs so that its competition would not have available the RAPs and therefore could not offer the plans, goes down the drain because you've just told me the competition didn't need the RAPs, they could just get the GICs. Well, we don't think that's the case. In other words, we don't think that's the case, Your Honor. Are you saying that GICs are a substitute for RAPs? Fidelity's documents seem to say that they were for Fidelity. If that's positive, then the whole motive makes no sense at all, because you're not precluding the competition. Even though they may be fungible substitutes for Fidelity, that doesn't mean that they're fungible substitutes for Prudential, New York Life, MetLife, other people who run GICs. As Fidelity points out, voluminously in its briefing, all these funds are different, it's not a one-size-fits-all exercise. At any rate... Is the issue somewhat different? Is the issue not the issue of whether they can get enough RAP insurance, but whether they can get RAP insurance at a rate which is favorable to the administration of their own funds? That's precisely the justice... Pardon me? That's precisely... Okay, expand on that. Sure, of course. So, the documents that I just cited show how that is so. And what they show is the RAP insurance that Fidelity did procure, that we complain of, Your Honor, that is the essence of our theory, that RAP insurance compared to these other fungible substitutes that I'm describing was unduly expensive in the sense that when Fidelity bought that RAP insurance and put it in place on the fund, like take, for example, that J.P. Morgan RAP insurance deal that I'm talking about, the overly stringent one, that particular purchase of RAP insurance tended to protect Fidelity's fees, its management fees, for running this portfolio. At the same time, it drove down the crediting rate paid to my clients, and all the while, all these other alternatives out there, which would have required Fidelity to earn less fees in order to use them on their own portfolio, rather. Separate account gigs, mutual home haul, those things Calocatronis mentioned, were not being used. So, Justice Souter, this is exactly what Fidelity did, and this is what we believe is a trial-worthy issue. If we prove that there was a fiduciary breach in Fidelity making self-interested decisions on what kind of RAP insurance to use for the fund to protect its fees, at the same time driving down the money that my clients earned on their investments, under Cigna versus Amana, all of those profits that Fidelity earned, according to its documents, it's a highly profitable niche product with an internal margin of 25%. They're making a lot of money on it. It wasn't shared with our clients. And they are all, at all times, a fiduciary. What does the record show? At the time Fidelity decided to buy the RAPs, what does the record show at that time, both as to the availability of these synthetic GICs, and as to their suitability as a surrogate? Good question, Your Honor. What the record shows is that they were available. Where would we look to find that? The documents that I just cited, Your Honor. They're internal Fidelity documents discussing the availability of the synthetic account GICs that we're talking about. In the time frame that we're talking about? Yes, Your Honor. So let me make sure I'm understanding the theory that you're pressing here, then. I think what you're saying, if I'm hearing you correctly, is that to make the stable value fund stable, in other words, to protect it from downward market movements, they actually had two alternatives, RAPs and these other alternatives, including the GICs. And they chose the RAPs because the RAPs would generate higher fees for them. Correct. Okay. Do you think the evidence shows that clearly? Yes, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. John Hacker for Fidelity. Among the many things I disagree with with my friend, Mr. Watkins, the first is that this case is oh so complicated. There are complicated arrangements, and the nature of stable value funds can be complicated to a layperson, but the case itself is easy. The entire case reduces to one proposition, and you'll hear it again today, and that is that Fidelity, in the relevant time period, never, never needed to obtain RAP coverage to protect NIP assets in 2010 and 2011, and therefore Fidelity must have been doing it imprudently and disloyally for a different reason, which is, they say, to use RAP coverage to create new separate account funds. That premise is unambiguously contrary to every, I mean every document in the record, including the very few documents that they cite. Those documents consistently show that Fidelity was facing an existential RAP crisis across all of its existing funds, including the NIP that we're talking about. Fidelity never. What do you say, what do you say, and the theory we just heard now in oral argument, okay, what do you say about that? They say that at the time you purchased the RAPs for this fund, you could have got GICs, and they would have had lower fees. Right, so much to say about it. The first is that, to answer Jeff's question, there's no record evidence whatsoever, not one document that shows during the relevant time period that GICs were an available and adequate substitute to Fidelity, and there's a reason for that. There's a reason there's no record on it. That's not the case they tried. They didn't put in their complaint, paragraph after paragraph, about the availability of GICs and the suitability of GICs. They didn't have their expert, Dr. Pomerantz, testify or submit a report or testify page after page about why GICs were an adequate substitute. That's not the case they tried. It comes up for the first time in the reply brief on appeal, and among the many problems with that, the one document Mr. Watkins cites to you, the Steve Kolokotronis email, his own answer defeats his case on GICs. He says that the document shows that GICs were fungible for Fidelity, but we have no idea. The answer to Jeff's question is we don't really know if they worked for anybody else. We know they worked for Fidelity. The Kolokotronis email is talking about one competitor, Galliard, and it says, and he's complaining, that Galliard is able to be a little more flexible because Galliard traditionally has used GICs. So all that says is that Galliard, in the past at the time, was using GICs. It doesn't say a word about their suitability for Fidelity. It doesn't say a word about what they would have to prove, which is that during this period in 2010. Isn't that up to you? In other words, wouldn't the appropriate thing at that point be if you have an evidentiary basis for saying it, to come up with the contrary view? And if they do not dispute that, then you have a classic example of a case in which there is a fundamental fact which is not subject to dispute. So a couple of points. First of all, they have the burden as plaintiff to show that GICs were there as an available substitute and should have been used and weren't. There's nothing in the record to support that element of the case that if they had pled and tried that case, they would have to satisfy it that way. And they never induced any evidence because that wasn't the case they tried. But leaving aside the waiver point, we're here now with a complete failure of proof on the availability of GICs as an adequate substitute during this time for Fidelity or for anybody else for that matter. The Calacatronis email doesn't even say that GICs were going to work for Galliard going forward. He doesn't say that in 2010-11 GICs were working for Galliard or anybody else. Let me follow up on Justice Souter's question because we have this rule 56 statement of material facts that is supposed to help the district court and us actually narrow these things down. Is there a statement of material facts or an opposition to a statement of material facts from the plaintiffs saying that at the time Fidelity made these decisions, GICs were available as an alternative to wraps and Fidelity knew it? I want to be careful because you hate to overstate the record. That's not a complete command of the statements of undisputed material facts. But I believe the only reference to GICs comes up in the plaintiff's response to our summary judgment motion. And it's just a conclusory reference to the Calacatronis email that says they were out there, but they don't do anything. You won't find them, I'm quite confident, in the relevant statements paragraphs reciting evidence that shows here's what the GIC market looked like, here's what the prices of GICs were, here's why they were beneficial to participants, here's why they were an adequate substitute to wrap. You won't, I'm confident, see anything like that in anything submitted by the plaintiffs below. And to just follow up on Justice Souter's question, this is a fiduciary case about the exercise of prudence by Fidelity, so not only did they fail to show that GICs were an adequate substitute, but the record does show, just because the case they tried is about whether we were considering the wrap problem, what you'll see in the documents, in document after document after document, is Fidelity considering the use of GICs as an alternative. I'll just give you some sites. You'll see that at Joint Appendix 2392 in July of 2009, the same time they're getting the JP Morgan coverage, they begin to talk about, well, maybe we should look into GICs. In March of 2010, in JA 645, another document, Fidelity considering the use of GICs as an alternative. Then in September of 2010, there's a great PowerPoint presentation that includes the pros and cons of GICs, and that's at Joint Appendix 664. Those aren't the only ones, those are just illustrative. You see them over and over again talk about the use of GICs as a potential alternative, but because the plaintiffs never tried a case that says, well, you were considering them, but you acted unreasonably in not using GICs, there's not a further record of how that all played out, what the market was like, whether competitors were using it, whether they would have worked for separate accounts for MIP. There's no record like that whatsoever, because that's not the case they tried. Mr. Heitker, I don't recall any mention in Judge Young's opinion about this theory of the case. Was this argued in the district court? The answer is no. To Judge Cahill's question, I was pointing out that it sort of came up in response to our summary judgment and the state of rebundant to use facts. There's not a developed argument in the summary judgment briefing that says, here's our theory. Our theory is that GICs were this perfect alternative. It would be unreasonable for anybody to use it. Everybody else was using it. Where's the evidence that all of our competitors lined up one after the other, just pouring GICs in the door? Mr. Watkins today tells you that you can't do that because they're not fungible for every entity out there. And yet he's the one to line a document that says only that Galliard used them. Kolkatronis does not say Fidelity should use it. Kolkatronis does not say there were sufficient, suitable alternatives for Fidelity. He's just complaining that Galliard is more flexible because Galliard does use it. He's one person. He's not even a portfolio manager. The evidence does show that the portfolio managers did consider the use of GICs and ultimately, for whatever reason, did not go down that road as the rat market eventually, finally, after repeated and consistent efforts by Fidelity to identify additional rat coverage, finally loosened up in the spring of 2012. I think the ultimate failure of plaintiff's claim, again, it's contrary to all the documents that show what we were doing and why we were doing it, but the two simple facts establish that the theory that we were really in it for the separate account business, for new separate account business, is flatly contrary to the law. It starts with, in July of 2009, when we get literally the last RAP available on the market, the J.P. Morgan RAP at $3.6 billion of it. What do we do with that? We allocate it across all the funds, including to MIP. It's not like we took that RAP and shoved it onto the new separate accounts or put it on the shelf so we could get new separate account business. We used it for our existing funds, not new separate account business. Then, for a period of almost three years, we're desperately looking for additional RAP coverage in a market that's completely frozen. The dog that didn't bark here is they had third-party discovery. They went looking for other competitors who were getting RAP. How many competitors did they find that got RAP in this period? Zero. Nobody did. We finally got it from Bank of Tokyo Mitsubishi in spring of 2012. What did we do with it? Plaintiffs would have you believe that we wanted RAP to sort of put on the shelf, excess RAP coverage, so that we could use it and go get new separate account business. We didn't really need it for MIP. Obviously, we had gigs the whole time. Why do we need it for MIP? What did we do with it in spring of 2012? We finally got $5.6 billion in RAP coverage. We allocated it to existing accounts and almost all of it to MIP. Not one dollar was put on the shelf and used for new separate account business. If we were being disloyal in pursuing RAP to create new separate accounts, we were remarkably stupid about it. It didn't happen that way. The documents, as I say, are unambiguously contrary to their theory. Let me just talk about a couple of the documents that they cite to be a little more specific about it. I think the fact that Mr. Watkins today turned to his gig theory, new gig theory, unsupported gig theory, tells you a sort of tacit recognition that the documents that exist disprove the theory that they've been trying all along. First of all, they rely on the July 2009 PowerPoint presentation document that says that MIP is currently open and that there's a lack of capacity for new separate account business. And that's really the foundation. It's really the only document they try to cite to say that we were interested in separate account business. On its face, that document is simply saying that the MIPs are open in the sense that they can take new clients and that separate accounts, they're also open. They can take new deposits. They can't take new clients because the way that market works is you can't have, you have to get new RAP coverage. And what that document says is there's no new RAP coverage available to service a new client. They could come, IBM could come into the MIP pools. That's all that document says. The participants that were in the MIP, if I understand the record correctly, they would have received on some periodic basis some indication of how the returns were coming in. That's correct. And they would have also, together with other employees, that those employers have been able to make decisions on some recurring, if not continuous basis, as to whether to put more funds with Fidelity in the MIP or not. Or vice versa, correct. And that would have affected Fidelity's fees. The more money that went into the account, the more Fidelity would get paid. I think all things being equal assets under management growing is a good thing, which aligns interests. I mean, everybody agrees that if you grow assets, that's better than not growing assets. But there's certainly no evidence here that Fidelity, either through pursuit of RAP coverage or investment strategies, engaged in some disparate strategy where it was trying to favor separate accounts that it didn't already have and thereby engaging in a consciously negative strategy to injure MIP and damage its interests so they could help its business elsewhere. That would be galactically, again, incompetent of both business and fiduciary strategy. And there's just no evidence of it. What the evidence shows is Fidelity perceived correctly an existential RAP crisis and was pursuing it to obtain needed, what their own expert concedes is needed, coverage for all of its accounts. There's certainly nothing disloyal about it, nor is there anything imprudent. I don't know how much I need to say about it, but their imprudence theory fails for many of the same reasons that their disloyalty theory fails, but it's a slightly different theory. And the problem with respect to the prudence theory, among other things, is that it's completely based on hindsight, the complaints about performance. At any given moment, the only question you ask of a fiduciary is at that moment, based on the information that you had, did you make a reasonable judgment about what to do? You can't say that you should have known somehow that the decision you made was going to result in a negative performance or not. Again, Dr. Pomerantz, at virtually every moment he undermined their case. He said that the Fidelity strategy, had economic circumstances developed differently, actually could have resulted in better returns for net percent participants. The conservative strategy, if interest rates had spiked, or if there had been a rebound failure, if asset prices had not rebounded, the participants would have experienced better returns. Of course, a fiduciary can't possibly know at any given moment what's going to happen in the future, and yet that's what they're expecting of the Fidelity's fiduciaries here. On the benchmark, I think Judge Kida's questions have led us to the correct answer there. Fully disclosed, the benchmark is telling you what the product is. As is, by the way, the statement, the mandate, that Mr. Watkins, as I think the judges have pointed out, didn't accurately or fully quote for the court. What that says is, in full, the mandate is to quote, seek the preservation of capital. Those are the first words. Seek the preservation of capital as well as to provide a competitive level income over time. You don't look at it for six months, nine months, one year, 18 months. Over time, consistent with the preservation of capital. And that's what I think Judge Selye had it right to say. The primary objective, yes, it's a single integrated objective, but the primary objective in that is preservation of capital, and then returns consistent with that, the subordinate objective being returns so long as you're servicing the principal objective of preserving capital, which is exactly what Fidelity was doing throughout this time period, as every document in the record shows. If there are no further questions, I'll reserve the balance of my time, and we request affirmance. Thank you very much. If I may, I just want to deal with what concern has become a canard. What I'd like you to deal with first is Mr. Hacker's statement that the theory you've elucidated for us about the availability and adequacy of GICs as the basis for your cause of action was not briefed and argued to the district court on your summary judgment motion. Sure. And that's exactly what I was going to address. I think it's the most important issue now before the court. This is not a new GIC theory. In fact, this GIC theory, if you want to call it that, is not our primary theory at all. Our theory is Fidelity, both with respect to the GIC issue that we've been discussing, as well as with respect to other issues concerning WRAP insurance, has consistently made a series of self-interested choices to enter into, for instance, restricted WRAP contracts with J.P. Morgan that drove down the crediting rate of the fund. I think it would be helpful if you'd answer, because I have the same question. Okay. So let's take it with respect to the statement of material facts, not in dispute. And the answer is, is your GIC theory mentioned or described in the factual predicate for that theory given in those documents? Yes, it is. And it comes from the words of Mr. Hacker's client, Mr. Kolokotronis, his entire statement that we quote both in the summary judgment briefing and in the briefing before this court. Yeah, I know that. But that doesn't say anything about the adequacy or availability of GICs at the time Fidelity was making this decision. I'm asking you about the Rule 56.1 statement that you filed. I understand, Your Honor. Where do I look in your statement to find a reference to GICs? The only place I'm aware of is the Kolokotronis statement, which, if I may add, the Kolokotronis statement clearly says that GICs are available, were available, that Fidelity didn't use them because, in his words, we have to do it our own way. We have to do it our own way. If they weren't available, he would not have made those comments. That's what appears, Your Honor. It doesn't appear otherwise, and that's consistent with that. When you say statement, you don't mean that he signed an affidavit. Correct. You mean the e-mail that you've put in to us. That's right, Your Honor. The puzzling thing here, to think it's puzzling us, is what you're putting forward today is your theory. The district court judge makes no mention of, and the opening brief not only doesn't criticize the district court judge for never addressing the theory of the case, but itself doesn't seem to advance the theory. That's right, and I'm afraid that it's snowballed because I merely intended to put it forth as one aspect of our theory. It's not the whole theory. We weren't intending to go have a trial only on the issue of whether or not GICs were available, whether or not they were optimized. And to that end, Mr. Hacker, who's an old colleague of mine, so we're very affectionate when we say things like this to each other, he keeps saying, well, that isn't the case they tried. That isn't the case they tried. We were resisting their summary judgment motion. We haven't had a chance to try our case yet. Thank you. Thank you, Your Honor.